**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOSEPH MAIORIELLO,**

          **Plaintiff,**　　　　　　　　　　**1:05-CV-1062**
    **vs.**　　　　　　　　　　　　　　　**(NAM/DRH)**

**NEW YORK STATE,**
**NEW YORK STATE SENATE,**
**NEW YORK STATE SENATE MINORITY,**

          **Defendants.**
_____

**APPEARANCES:**　　　　　　　　　　　　　**OF COUNSEL:**

Maynard, O'Connor, Smith & Catalinotto, LLP　　Anne-Jo P. McTague, Esq.
6 Tower Place
Albany, NY 12203
_Attorney For Plaintiff_

Office of Attorney General　　　　　　　　　Stephen M. Kerwin,
The Capitol　　　　　　　　　　　　　　　Assistant Attorney General,
Albany, NY 12224　　　　　　　　　　　　of Counsel
_Attorney For Defendants_

**Hon. Norman A. Mordue, Chief U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.　　INTRODUCTION**

     Defendants New York State, New York State Senate, and New York State Senate

Minority move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure in this employment discrimination action.  In the amended complaint, plaintiff Joseph

Maioriello, who worked as a photographer, videographer, and cable television coordinator, claims

that defendants discriminated against him on the basis of his race or color.  Specifically, plaintiff,

a Caucasian, asserts that Senate Minority leader David Paterson, an African-American, fired him

in order to hire an African-American photographer in plaintiff's stead.  The amended complaint advances three causes of action: termination based on race or color, in violation of 42 U.S.C. § 2000e ("Title VII"); intentional infliction of emotional distress; and loss of opportunity for employment benefits.[1]  Plaintiff opposes defendants' motion for summary judgment.

## II.    BACKGROUND

The following facts are undisputed:  The New York State Assembly employed plaintiff from 1977 to 1989.  In 1989, plaintiff changed employment and moved to the New York State Senate, where he worked as a photographer and cable television coordinator.  Since a new legislative body is established following each biennial general election, plaintiff re-applied for his position every two years.  Each time, plaintiff signed an employment application indicating his understanding that "if appointed", he would "serve at the pleasure of the Senate, that my employment is at will, that I am not guaranteed employment for any specific period of time, and that my employment may be terminated by the Senate at any time without prior notice."  On March 30, 2003, after working in the New York State legislature for twenty-six years, plaintiff received notice that Senate Minority leader David Paterson had decided to terminate his employment.

Many of the events leading up to and surrounding the termination of plaintiff's employment are disputed.  The following is a summary of the evidence relevant to the disposition of the instant motion.

### A.    Defendants' Evidence on the Motion

#### 1.    Senator David Paterson - Declaration and Deposition Testimony

---

[1]Defendants only seek summary judgment on plaintiff's Title VII claim.

In his declaration, Senator Paterson described the staffing in the Senate:

During my entire tenure in the Senate, the Democrats have been in the minority and the Republicans have had the majority, though the disparity in number of members in each caucus has diminished in recent years to the point where the Democratic caucus now has twenty seven members while there are thirty-five members of the Republican caucus.

In addition to its members or Senators, the Senate employs hundreds of staff members who support the Senate and its members in the pursuit of the Senate's business. These employees may be roughly divided into two separate categories: those employees who work on the central staff of the Senate, and those who work in the offices of the individual senators.

Each of those categories may be further dividend into two subcatgories: central staff members either work for the majority party, currently the Republican party, or the minority party, currently the Democratic party. Employees on central staff work at the pleasure of the senator elected by his or her caucus as the caucus leader. Employees who are on the staffs of individual senators either work for the member in Albany, or in his or her district office located in the member's senatorial district. These employees work at the pleasure of the individual senator on whose staff he or she serves.

All Senate employees are "at will" employees. They can be terminated from Senate employment at any time, with or without cause. They are in the "unclasssifed service" (New York Civil Service Law section 35 (c)), and are afforded no protection by the New York Civil Service Law section 75. They have no employment contract and are not covered by any collective bargaining agreement. At the beginning of each two-year legislative session, each Senate employee must sign an Employment Application which states in part, I understand that I will serve at the pleasure of the Senate, that my employment is at will, that I am not guaranteed employment for any specific period of time, and that my employment may be terminated by the Senate at any time without prior notice. These documents are signed every two years in the January following the general election for legislative members since, in effect, there is a new legislative body every two years.

All Senate staff members are employees of the Senate; the Senate majority and the Senate minority employ no one. Nonetheless, by Senate tradition, the leader of each caucus makes employment decisions - hiring, salary, continued employment or termination - for employees who work for the caucus. The same decisions are made by the individual Senate member for his or her office staff, even though those employees, too, are employed by the Senate.

Each of the two caucuses in the Senate is run by a leader elected by the members of

the caucus. In addition to legislative responsibilities, the caucus leader (Majority leader or Minority leader) is given control of the central staff which works for the caucus. The leader decides who is hired, who is terminated, and what salary is paid to each member of the central staff working for his or her caucus. These decisions are not made in a vacuum, however, since each leader holds his or her position by dint of election by his or her caucus colleagues. Thus the leader is constantly bombarded with recommendations from caucus members to hire, fire, or adjust the salary or duties of staff members.

In November 2002, Senator David Paterson challenged Senator Martin Connor, the incumbent Minority leader, in the caucus election for Senate Minority leader and prevailed. Senator Paterson stated in his declaration that when he assumed the role of Minority leader, he "became in charge of approximately 143 employees who worked on the minority caucus' central staff." Senator Paterson averred that he could not count on the transfer of these staff members' loyalties from Senator Connor to himself because, unlike assuming the position following a Senator's retirement or failure to win reelection, Senator Paterson defeated Senator Connor, a sitting Senator, in an election. Therefore, Senator Paterson stated, he was hesitant to "continu[e] in place persons who had been on his staff for fear that the confidentiality any leader needs would be compromised, and delicate matters would be communicated to a former and potentially future rival for the leader's position."

Senator Paterson attempted to assess the staff he inherited, but his effort "was crippled by the refusal of Senator Connor to provide me with any documents concerning staff members." Consequently, Senator Paterson compiled a roster of employee names and positions. When he became Minority leader, Senator Paterson learned that "there was a photographer [Joseph Maioriello] on my staff." Senator Paterson stated that he "did not know much about the incumbent in that position . . . since [he], as one of twenty-three or twenty-seven members of the Democratic caucus, had little contact with him." Senator Paterson avers that his "impression"

4

when he became the Minority leader was that the photographer "would often be in my presence taking pictures" and would therefore have the "opportunity" to listen to his "confidential discussions with my staff or other senators, in person or on the telephone".  Senator Paterson explained that "[s]ince [plaintiff's] loyalty to me was, in my mind, in question since he had been Senator Connor's photographer, I perceived a need to have someone in that position whose loyalty to me was not in question."

Early in his tenure as Minority leader, Senator Paterson's staff and Senator Malcolm Smith, who had supported his election as leader, recommended J. El-Wise Noisette, a photographer, to replace plaintiff.  Senator Paterson stated that Noisette is an African-American and that he had been the photographer for Carl McCall, the former New York State Comptroller.  Senator Paterson averred that he and McCall were, and continue to be, "very good friends."  Senator Paterson stated that his staff and Senator Smith informed him that McCall and his staff "highly recommended" Noisette and that he had heard  "Noisette's photography work was . . . of high quality."  Senator Paterson, who is visually impaired, asserted that he "never viewed the work of either photographer" but "assumed that [plaintiff and Noisette] were equally competent at their craft".  Senator Paterson avers that the "key distinction" to him "was on the question of loyalty" because plaintiff had been on the staff of his rival, Senator Connor, who "did not take well his defeat" and whom he suspected was plotting with "other senators loyal to him to re-gain control of the caucus".  Therefore, Senator Paterson states, he "could not be certain that [plaintiff] was not part of that effort."  Although Senator Paterson knew Noisette no better than he knew plaintiff, he "determined that if McCall could trust Noisette, so could I."  *Id*.

Senator Paterson averred that although his staff and several members of his caucus urged

5

him to hire Noisette, the decision to do so was his alone.  Senator Paterson stated that he "directed [his] staff to carry out [his] determination to terminate the plaintiff's employment and to offer employment to Mr. Noisette" but that he "was not involved in the execution of this direction". Senator Paterson asserted that race never entered his calculus in determining the position of photographer and "[g]iven my visual impairment I did not know for certain the race of either the plaintiff or Noisette."

Senator Paterson stated in his declaration that after deciding to terminate plaintiff's employment and hire Noisette, he learned "there was some criticism of [plaintiff's] performance, more in terms of his reliability than his skill in taking pictures."  Senator Paterson further stated: "That criticism, learned after the fact, did not enter into my decision as to which photographer to employ."

## 2.    **Tracey Pierce-Smith** - Declaration

Tracey Pierce-Smith, Director of Senate Minority Conference Services and Correspondence, stated in her declaration that she was plaintiff's direct supervisor.  Pierce-Smith averred that when Senator Paterson replaced Senator Connor as Minority leader, she "was asked to prepare a memorandum for the new leadership presenting my view of the direction of Conference Services and its staff."  In a memorandum dated December 12, 2002, Pierce-Smith outlined her assessment of Conference Services's "structure and staffing, frankly commenting on the quality of some of [her] subordinates."   About plaintiff, Pierce-Smith wrote:

> While Joe Maioriello is a decent photographer, I know there have been some complaints lodged against him from Members. I truly cannot work like that. I need someone who's sole reason for being is to make the conference happy.  Further, the nature of his position really begs for it to be a session only job.  And Joe does not motivate himself to make good use of his time during the off session.  He will certainly do anything I ask of him, and I appreciate that, but he does not bring another

> talent to the table to allow me to say that I can account for his off session time.
>
> If I did not someone [sic] to replace Joe at this time, my recommendation would be to make this job a session one. It is a necessary position, and Joe has a good amount of institutional knowledge. That said, we do have the ability to hire someone immediately who would more than serve our purposes. El-Wise Noisette is an incredible catch. Once again, in addition to his sharp photography skills, El-Wise can manage website and has experience with Quark, which can be useful as a backup for the Graphic Artist. His addition to my staff would be a great investment indeed, and he would have other assignments to occupy his non-session work time. So, if we were to hire El-Wise, which I am strongly recommending, we could keep the photography job as a full-time position.

Defendant's Ex. A.

Pierce-Smith stated that in November 2002, she received J. El-Wise Noisette's resume from Senator Ada Smith, one of the senators who had complained about plaintiff's job performance. Pierce-Smith averred that she interviewed Noisette and was impressed with his credentials, skills, and the flexibility he could provide as a graphic artist and in assisting with posting material on the Senate's web site. Pierce-Smith and a number of senators recommended Noisette's hiring. Pierce-Smith stated that her supervisor then interviewed Noisette. According to Pierce-Smith, "[t]hereafter the decision was made by the new leadership, presumably Senator Paterson, that Mr. Noisette should be hired as the caucus' photographer, and that the plaintiff's employment should be terminated."

According to Pierce-Smith, on March 20, 2003, she and Senator Paterson's Deputy Chief of Staff, John McPadden, met with plaintiff in her office. In her declaration, Pierce Smith described the conversation:

> Mr.McPadden informed the plaintiff that certain proposals that he had made with regard to electronic media were not accepted by the new leadership. Mr. McPadden then informed the plaintiff that his employment with the Senate was being terminated. He was informed, in response to his inquiry, that he was being terminated because the new leadership had another photographer in mind. He asked if the person replacing

him was African-American. Mr. McPadden told him he was, but that it did not matter, it had no bearing on the decision. After a discussion as to the plaintiff's final day of employment, the meeting ended.

### 3.      John McPadden - Deposition Testimony

McPadden testified that during the March 20, 2003 meeting, he informed plaintiff that Senator Paterson had decided to terminate plaintiff's employment.  Specifically, McPadden stated that he indicated to plaintiff "that the responsibilities that he was currently undertaking for the Senate Democratic Conference were not valued under the current administration in the same sense as they had been previously and they wanted a change in direction."

McPadden testified that he knew, going into the meeting, that he would be terminating plaintiff's employment but that "[t]here were no specific reasons given to me" as to why. McPadden stated that he told plaintiff that someone had been appointed or selected for his position, and further testified that: "I do not know if the specific name was mentioned.  I do recall in the conversation that the issue was raised that his successor was an African-American, but I believe there was a specific reference made to the fact that that is not the reason why he was being replaced."  McPadden stated that he believes that this issue arose because plaintiff "asked if he was being replaced by an African-American photographer."  In response to a question at his deposition whether at any point during the meeting he indicated to plaintiff that "the black senators wanted a man of color in [the photographer] position?", McPadden testified that he "did not."

### B.      Plaintiff's Evidence on the Motion

Plaintiff opposes defendants' motion and contests many of the relevant facts.  As an initial matter, plaintiff, in his affidavit, contests Senator Paterson's belief that the Senate minority

photographer was a position that required loyalty to the Senate minority leader.  Plaintiff states that during his employment:

> I did not have a management confidential position; I was not in a policy making position; I was not a confidante of any Senator, or Senate Leader.  I did not travel with any of the three Senate Minority Leaders holding such position during my employment with the Senate; on occasions when I would photograph the Senate Minority Leader at a remote location, we would travel there separately; I would arrive ahead of the Senate Minority Leader to arrange equipment, and such, in preparation of the Senator's appearance.

Plaintiff further states that he "was never, as the photographer for the entire Minority Conference in such a confidential position with any Senator during my fourteen years as the photographer for the Senate, or the previous twelve years as photographer for the state Assembly."

Regarding the day of his termination, plaintiff testified that at approximately 6:00 p.m., Pierce-Smith telephoned him to inform him that a "friend" was coming down to see him. Plaintiff stated that he walked out of his office space and met McPadden.  Plaintiff stated that he and McPadden joined Pierce-Smith in her office where McPadden informed plaintiff that "Senator Paterson is relieving you of your duties."  Plaintiff testified that he asked why, and that McPadden responded that there were minority senators, "people of color", who "want to replace you by . . . another photographer."  According to plaintiff, McPadden went on to say "you know who it is", and that "you know, they want to replace you with a minority photographer, a black photographer, and you know who El-Wise is."  Plaintiff testified that he again asked "why?" and that McPadden responded "you got to remember who Senator Paterson is.  Senator Paterson is black."  Plaintiff stated that Pierce-Smith said nothing during the meeting.

On June 5, 2003, plaintiff filed a complaint with the United States Equal Employment Opportunity Commissioner ("EEOC") alleging employment discrimination based on race.  In

9

response to plaintiff's charge of discrimination, McPadden filed an affidavit dated July 8, 2003,

averring as follows:

> On or about March 20, 2003 I attended a meeting with Joseph Maioriello and his direct supervisor Tracey Pierce-Smith.
>
> I attended this meeting because the decision had been made to terminate Mr. Maioriello as a result of his poor performance and assignment tardiness.
>
> On or about March 20, 2003, I advised Mr. Maioriello that he was being provided with two-week notice of termination, and requested that he vacate the premises as of the following Wednesday, March 26, 2003.
>
> Upon inquiry by Mr. Maioriello, I advised him that certain members of the Senate Minority Conference had chosen to replace him with another photographer based upon his poor performance and reliability.
>
> Although Mr. Maioriello inquired as to whether or not the replacement photographer was a member of a minority group, I told him that the new photographer's race was not a factor in the decision to terminate his employment.
>
> To my knowledge, there have been a number of complaints that have been made by our conference's members with regards [sic] to Mr. Maioriello's performance, during his employment tenure with the New York State Senate.
>
> I never advised Mr. Maioriello that the reason he was being terminated from his employment position was so that the Senate Minority Conference could hire an African-American person for this position.

(Paragraph numbers omitted).

In an affidavit dated July 8, 2003, Pierce-Smith also responded to plaintiff's charge of

discrimination, stating:

> On or about March 20, 2003, Mr. Maioriello was advised that he would be provided with two-week notice of termination, and that he should vacate the office premises as of the following Wednesday, March 26, 2003.
>
> Upon inquiry by Mr. Maioriello, he was advised that the basis for his termination had nothing to do with either his race or that of his replacement.
>
> To my knowledge, there have been a number of complaints that have been made by

our conference's members with regards [sic] to Mr. Maioriello's performance, during his employment tenure with the New York State Senate.

(Paragraph numbers omitted).

On September 30, 2004, the EEOC issued a Determination.  In it, the EEOC stated that although defendants maintained that plaintiff was terminated based on poor performance and reliability, they failed to provide "any substantive evidence to support [their] position" such as performance evaluations, the identities of employees who complained about plaintiff's performance, or "any specificity on the alleged complaints."  Thus, the EEOC concluded, "there is reason to believe that violations have occurred".  The EEOC then invited the parties to enter a settlement discussions and a conciliation process.

Efforts to conciliate the charge of discrimination failed and the EEOC referred the matter to the United States Department of Justice for review to determine whether the Department of Justice would sue on plaintiff's behalf.  In a letter dated June 1, 2005, the Department of Justice notified plaintiff that it would not file suit, and issued a right to sue letter.  On August 24, 2005, plaintiff commenced this action.

Defendants move for summary judgment dismissing plaintiff's Title VII claim on the basis that plaintiff was not an employee under Title VII.  Alternatively, defendants argue they are entitled to summary judgment because plaintiff has failed to adduce evidence demonstrating a question of material fact as to whether defendants terminated his employment based on race or color.  Finally defendants assert that in any event,  New York State and the New York State Senate Minority should be dismissed as defendants from this action because they were not plaintiff's employer.  Plaintiff opposes defendants' motion.

**III.    DISCUSSION**

11

### A.      Applicable Legal Standard

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If a court, viewing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in his favor, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial.  *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).  If the nonmovant fails to carry this burden, summary judgment is appropriate.  *See Celotex*, 477 U.S. at 323.

Courts have acknowledged the dangers of summary judgment in discrimination cases.  "Because direct evidence of ... discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'"  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (quoting *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  A plaintiff must, however, provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.  *Schwapp*, 118 F.3d at 110.

### B.      Title VII Employee

Defendants argue that Title VII does not apply to this action because plaintiff was a member of Senator Paterson's "personal staff", an employment category Title VII expressly exempts from its definition of employee.  Title VII states, in relevant part:

> The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or

12

political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's *personal staff*, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.

42 U.S.C. § 2000e(f). Title VII does not define "personal staff".  Further, while the Second Circuit has addressed the "policy maker" exemption to Title VII's definition of employee, it has not considered the "personal staff" exemption.  *See e.g., Butler v. New York State Dept. of Law*, 211 F.3d 739 (2d Cir. 2000) (finding the Deputy Bureau Chief in Attorney General's Office was policy maker within meaning of statute so as to exempt her from protection under Title VII); *Tranello v. Frey*, 962 F.2d 244 (2d Cir. 1992) (holding that policy maker must be chosen by elected official to fall under exemption).  The Second Circuit has twice suggested, however, that an elected official's personal staff and his immediate advisors "refer to persons who would work closely with the elected official".  *EEOC v. State of Vermont*, 904 F.2d 794, 798 (2d Cir. 1990), *overruled on other grounds by Gregory v. Ashcroft*, 501 U.S. 452 (1991); *see also Tranello*, 962 F.2d at 249 (finding that the "personal staff" category of employee in the ADEA[2] "plainly contemplate[s] exemption for persons with a direct relationship to an elected official.").  The report of the conference committee of the House and Senate on this section states in relevant part:

It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees (sic) intent that this exemption shall be construed narrowly.

---

[2]The definition of "employee" found in ADEA is identical to the provision contained in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f), thus, Courts may look to the legislative history of that provision for guidance.  *Vermont*, 904 F.2d at 798.

(1972) U.S.Code Cong. & Ad.News 2180.

Defendants assert that plaintiff was an "at-will" employee who was not subject to the Civil Service Law.  Further, defendants claim that Senator Paterson had plenary powers of appointment and removal over all central staff members, including plaintiff.  Defendants admit that plaintiff "held a relatively low level of position within the chain of command in the Senate Minority" Mem. of Law, p. 15, but claim that is "irrelevant".  Defendants also assert that Senator Paterson needed to trust the photographer he hired and "rely on the photographer's loyalty and discretion during the performance of the photographer's duties."  Additionally, defendants claim, it was Senator Paterson's "impression" that the photographer would be in a position to overhear Senator Paterson's confidential discussions with staff members or other senators.  Thus, defendants argue plaintiff occupied a position of trust and should be considered a member of Senator Paterson's personal staff.

Viewing the facts in the light most favorable to plaintiff, however, the evidence can be construed as revealing the photographer as a member of the Senate Minority's central staff with little or no direct relationship with the Senate Minority leader or any senator.  Senator Paterson stated in his declaration that the Senate staff could be divided into two categories, "those employees who work on the central staff of the Senate, and those who work in the offices of the individual senators."  There is no evidence that plaintiff worked in the office of an individual senator at any time.  Further, plaintiff testified that he was never in a "confidential position with any Senator" during his employment with the legislature.  Additionally, Senator Paterson testified that he was "mistaken as to how much access [the photographer] would have" to him as he performed his duties.  Plaintiff stated that he was never any Senator's confidante, and never

14

traveled with any senator when he had to photograph a senator at a remote location.  Thus,

viewed in the light most favorable to plaintiff, a reasonable fact-finder could conclude that

plaintiff was part of the Senate Minority's central staff, but not part of Senator Paterson's - or any

senator's - "personal staff".[3]  Accordingly, defendants' motion for summary judgment on the

---

[3]As discussed, the Second Circuit has not addressed the personal staff exemption specifically.  The Fifth Circuit, however has set forth a six-factor test to determine whether an employee falls within the personal staff exemption:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only the elected official, (3) whether the person in the position at issue represents the elected official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Teneyuca v. Bexar County*, 767 F.2d 148, 151 (5th Cir.1985).

Even applying this test, the evidence, viewed in the light most favorable to plaintiff, suffices to raise a question of fact as to whether plaintiff was a member of any senator's personal staff.  According to plaintiff, the Senate Minority leader has plenary powers of appointment and removal to be sure, but, does not supervise the photographer position directly.  Indeed, the Director of Conference Services supervises the photographer position.  There is no evidence that the photographer represents the Senate Minority leader, or any senator in the eyes of the public.  Although the Senate Minority leader controls the photography position, plaintiff has adduced evidence that the photographer received assignments from most if not all Senate minority members.  There is also evidence showing that while the Senate Minority leader had the authority to fill the position or terminate employment, the photographer was under the direct supervision of the Director of Conference Services, who oversaw other members of the Senate minority's central staff.  Thus, viewed in plaintiff's favor, the evidence indicates that he was low in the chain of command.  Moreover, there is little evidence of intimacy between any Senate Minority leader and plaintiff.  Senator Paterson only averred that he *believed* there might be times when plaintiff would be working closely with him and therefore be privy to private conversations.  Finally, plaintiff stated in his affidavit that he never was any senator's confidante and never traveled with any senator.  Thus, even under the Fifth Circuit's test, the evidence, when viewed in plaintiff's favor, raises a genuine issue of material fact as to whether he fell within the personal staff exemption to Title VII coverage.

15

basis that Title VII does not provide coverage to plaintiff is denied.

### C.    Title VII Burden-Shifting Test

To evaluate plaintiff's Title VII claim, the Court employs the three-step, burden-shifting process articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The first step in the *McDonnell Douglas* formulation requires plaintiff to prove a *prima facie* case of discrimination by the employer.  *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446-47 (2d Cir. 1999).  To establish a *prima facie* case, plaintiff must show that 1) he is a member of a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination.  *See Norville v. Staten Island Univ. Hosp*., 196 F.3d 89, 95 (2d  Cir. 1999).  The burden of establishing a *prima facie* case is not onerous, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); indeed, it has been described as "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

As initial matter, defendants suggest that because plaintiff is Caucasian, a "majority group", he must allege special circumstances to survive summary judgment.  Relevant Second Circuit case law provides no authority for this proposition.  In *Terry v. Ashcroft*, the Second Circuit found that plaintiff had presented sufficient evidence to show he was a member of a protected group because defendants allegedly discriminated against him on the basis of his race: Caucasian.  336 F.3d 128, 138 (2d Cir. 2003).  Nowhere in the decision does the Second Circuit indicate that plaintiff was required to allege "special circumstances".  Accordingly, the Court proceeds to determine whether plaintiff alleges a *prima facie* case of discrimination.

First, plaintiff, as a Caucasian, was allegedly discriminated against on the basis of his race.  Second, plaintiff has adduced evidence demonstrating that he satisfactorily performed his duties as a photographer for approximately 26 years.  Third, plaintiff suffered an adverse employment action as a result of Senator Paterson's decision to terminate his employment.  Finally, viewing the facts in the light most favorable to plaintiff, the circumstances under which he was terminated give rise to an inference of discrimination on the basis of race because he was replaced by an African-American.  Thus, plaintiff has satisfied his minimal burden of demonstrating a *prima facie* case of race discrimination.

In the second step of the *McDonnell Douglas* test, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  *See Bickerstaff*, 196 F.3d at 446.  The defendant's burden of production is not a demanding one; it need only offer an explanation for the employment decision.  *See St. Mary's*, 509 U.S. at 507.

In this case, Senator Paterson stated that he believed plaintiff, as the Senate Minority photographer,  "would often be in my presence taking pictures . . . . during moments when I was having confidential discussions with my staff or other senators . . . giving the photographer the opportunity to listen to my private conversations."  Senator Paterson further averred that he questioned plaintiff's loyalty to him because plaintiff had served as the photographer under his rival, Senator Connor.  Senator Paterson stated that he assumed plaintiff and Noisette "were equally competent at their craft", but because his staff urged him to hire Noisette, and his friend Carl McCall trusted Noisette, he determined he could trust Noisette, too, and directed his staff to "terminate the plaintiff's employment and to offer employment to Mr. Noisette."  Doubts about plaintiff's loyalty to Senator Paterson is a legitimate, non-discriminatory reason for terminating

17

plaintiff's employment as it has no bearing on plaintiff's race.

The burden then shifts back to plaintiff in the third step of the *McDonnell Douglas* process, to demonstrate that the proffered reason was not the true reason for the employment decision, and that race was the true reason.  *See Bickerstaff*, 196 F.3d at 446.

In this case, viewing the evidence in the light most favorable to plaintiff, the Court finds that there is evidence from which a reasonable fact finder could conclude that Senator Paterson's decision to terminate plaintiff based on his doubts about whether plaintiff would be loyal to him was a pretext for unlawful discrimination based on race.  Plaintiff states he had been a legislative photographer for twenty-six years, and avers in his affidavit that he never traveled with any legislative leader, was not any legislative leader's confidant, was not present for unguarded conversations between a legislative leader and any other person, and was not a policy making member of any legislative leader's staff.  Thus, there is evidence, when viewed in the light most favorable to plaintiff, that Senator Paterson had no basis on which to question plaintiff's loyalty to him since plaintiff did not occupy a position which required such loyalty and trust.

Additionally, plaintiff asserts, during the EEOC investigation, Pierce-Smith and McPadden both asserted in their affidavits in opposition to the charge of discrimination that plaintiff was terminated due to "poor performance and assignment tardiness".[4]  As plaintiff points out, Senator Paterson admits that he did not know there were any complaints about plaintiff's performance until after he terminated plaintiff's employment.  Thus, there is evidence from which a jury could conclude that plaintiff's loyalty and/or poor performance were not the real reasons

---

[4]Defendants have not relied on this reason for plaintiff's termination in connection with the instant motion.

18

for his termination, either.  Accordingly, plaintiff must adduce evidence demonstrating that his race was the real reason defendants terminated his employment.

As discussed above, the evidence shows that plaintiff was replaced by an African-American.  Additionally, plaintiff states in his affidavit that when McPadden told him that Senator Paterson decided to terminate his employment McPadden further informed him "the reason I was being discharged from my employment was because some of the black Senate members of the Democratic Conference wanted to replace me with 'a man of color'."  So long as this assertion is in admissible form, it is sufficient to raise an issue of material fact as to whether defendants terminated his employment because he is Caucasian.

Defendants argue that the above assertion is inadmissible hearsay.  Rule 801(d)(2)(D) of the Federal Rules of Evidence provides that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  As the Second Circuit has acknowledged, "[l]iberal admissibility of this sort of proof" is permitted because "an employee is usually the person best informed about certain acts committed in the course of his employment, and . . . while still employed an employee is unlikely to make damaging statements about his employer, unless those statements are true."  *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992) (citing McCormick on Evidence § 267 (2d ed. 1972); 2 Wigmore, Evidence § 280(2) (Chadbourn rev. 1979)).  For this statement to be admissible, plaintiff must establish: "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency."  *Id.*

19

In this case, viewing the evidence in the light most favorable to plaintiff, there is evidence that McPadden was Senator Paterson's Chief Deputy, and therefore a Senate employee. Further, the alleged statement was made during the course of McPadden's employment with the Senate; McPadden and Senator Paterson both testified that by informing plaintiff that his employment had been terminated, McPadden was discharging Senator Paterson's instruction to execute his decision on this matter. Finally, this evidence also demonstrates that the statement plaintiff alleges McPadden made related to a matter within the scope of the agency because it is undisputed that Senator Paterson authorized McPadden to relay his decision regarding plaintiff's employment to plaintiff. Thus, viewed in the light most favorable to plaintiff, there is evidence in admissible form, for purposes of summary judgment, from which a jury could find that plaintiff was terminated so that Senator Paterson could hire an African-American photographer in his place. Accordingly, the Court finds that plaintiff has raised issues of material fact sufficient to survive summary judgment.

### D.   Title VII Employer

Defendants assert that New York State and the New York State Senate Minority should be dismissed as defendants from this action because the New York State Senate is plaintiff's only employer. Plaintiff opposes defendants' motion and argues that New York State provided his paycheck and health insurance benefits and that the parties who terminated his employment were members of the New York State Senate Minority.

"[T]he existence of an employer-employee relationship is a primary element of Title VII claims." *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006). The Supreme Court has emphasized that "when Congress has used the term 'employee' without defining it, . . .

20

Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989). In "analyzing employment relationships under Title VII," the Second Circuit has advised courts to look to:

> the hiring party's right to control the manner and means by which the product is accomplished .... [;] the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id*. at 371-72 (quoting *Reid*, 490 U.S. at 751-52). "No one of these factors is determinative" *Reid*, 490 U.S. at 752, but "the common-law element of control is the principal guidepost that should be followed". *Clackamas Gastroenterology Assocs., P. C. v. Wells*, 538 U.S. 440, 448 (2003).

In this case, neither party has briefed the fact-specific inquiry outlined above, much less pointed to evidence in the record substantiating either argument. Accordingly, summary judgment is denied.

### E.      EEOC Determination

Defendants argue that the Court should not consider the EEOC determination in resolving this motion or admit the determination at trial. As discussed, plaintiff has adduced evidence through his affidavit and deposition testimony showing there are disputed issues of material fact requiring trial, therefore the Court need not reach defendants' argument at this time. Defendants are, however, free to renew their arguments in a motion in limine prior to trial.

## IV.     CONCLUSION

For the foregoing reasons, it is hereby

21

**ORDERED** that defendants' motion for summary judgment is **Denied** in its entirety.

**IT IS SO ORDERED.**

Date:  February 12, 2008

_____
Norman A. Mordue
Chief United States District Court Judge